2022 IL App (1st) 201254

SIXTH DIVISION
Filing Date March 31, 2022

No. 1-20-1254

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 19 CR 9703 |
| IFEANYI OKORO, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Charles Burns, |
| | ) | Judge, Presiding. |

_____

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justice Mikva concurred in the judgment and opinion.
Presiding Justice Pierce dissented, with opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Ifeanyi Okoro was found guilty of home invasion, attempted criminal sexual assault, robbery, and unlawful restraint. He was sentenced to concurrent sentences of 11 years for home invasion, seven years for robbery, and seven years for attempted criminal sexual assault. On appeal, defendant contends that: (1) his rights under the grand jury clause of the fifth amendment were violated because the evidence at trial and the jury instructions constructively amended the indictment and (2) he was denied his constitutional right to cross

examine the complainant (A.B.) and present his theory of defense. For the following reasons, we affirm.

¶ 2                                         I. BACKGROUND

¶ 3     The circumstances that led to defendant's June 20, 2019, arrest arise from events that occurred on the morning of May 12, 2019, after defendant gave complainant a ride home. Defendant was later charged by indictment with home invasion, attempted criminal sexual assault and robbery. The home invasion charge specifically alleged that defendant "entered" A.B.'s apartment without authority, and that defendant's conduct violated 720 ILCS 5/19-6(a)(2) (West 2018).

¶ 4     On September 3, 2019, the State filed a motion *in limine* asking that defendant "be precluded from introducing any evidence of the past sexual conduct of the victim" and asserted that such evidence was barred by the rape shield statute, codified coat 725 ILCS 5/115-7 (West 2018). A hearing was held on the motion on September 10, 2019, at which time the following exchange took place:

"THE COURT: Correct me if I am wrong, Mr. Crone, but you're asking that any prior sexual conduct, activity between the victim and unrelated -- individuals unrelated to this defendant would be barred.

MR. CRONE [(ASSISTANT STATE'S ATTORNEY)]: Correct.

MR. RYAN KOSZTYA [(DEFENSE COUNSEL)]: No issue as to that.

However, if I may, indulge me for a second. Four police officers arrive to the scene after the alleged incident. All four police officers have body cams on. Videos at length. She blurts out about an hour and a half in, ballpark time, I have been raped before. No detail, no follow-up question. No further elaboration whatsoever. Just I have been raped before.

THE COURT: What's your position on that?

MR. CRONE: I would seek that not be [*sic*] allowed. In fact, be excised from any video that is played as it goes directly to prior sexual conduct of the victim.

THE COURT: Are you saying it should be admissible, [defense] counsel?

MR. KOSZTYA: I should be able to potentially use it and indulge me. The allegation is that after my client was in her condominium unit, he used the bathroom, was purported in the bathroom for 90 seconds. And then the allegation is he essentially started to attack her.

My client's defense is going to be generally stated I did no such thing. I exited the bathroom and as soon as I got out of the bathroom she started yelling, screaming, carrying on at me. And I didn't know what happened. Like she had changed from night and day. I want to be able to postulate potentially or at least I want the opportunity to do so, I don't know if I am going to do so, that based on whatever experience she had with that that she volunteered to the police officers, there was something when my client walked out of the bathroom without any contact, without anything more that triggered an emotional reaction from her.

I want to be able to potentially at least have the door open to touch on it.

THE COURT:  How can you do that. That's really speculative unless you have a good faith basis to follow up on it.

MR. KOSZTYA: My good faith is based on what she volunteered and there was no questioning of the officers of whether she's been involved in something like this before. She literally stated it out of the blue and volunteered it.

THE COURT: Counsel.

MR. CRONE: Even an allegation of being a prior victim of this sort of offense is still of a sexual nature. It's still barred by the rape shield.

I don't know of any rule, of any case law of [*sic*] anything like that provides an exception for being a victim previously. I believe that the statute and the pounds of case law following that statute would still apply.

THE COURT: Obviously in a case such as this the victim's credibility is at issue. Obviously[,] the victim's credibility is the [l]ynch pin of this particular case.

The reason rape shield is law is number one, they don't want parties to be able to infer that an individual that might have had sexual contact with another individual would be more likely to give consent on a particular occasion. In other words, putting the victim on trial.

The mere fact that she said she might have been raped before, I don't know how it would come into play whatsoever. She could have been - - there's no allegation that she made a false accusation of rape before. Nor is there any allegation that she's been raped before and what happened.

I understand your position here, counsel, but I think it's really speculative that you're trying to as you say, postulate the fact that she might have been hypersensitive with regard to being alone with a person and therefore cried rape. But I don't believe there's a sufficient nexus here. I think it's prohibited by statute.

MR. KOSZTYA: I didn't mean to interrupt you. That's the crux of my whole defense.

THE COURT: I understand that.

MR. KOSZTYA: That's his case.

THE COURT: I do understand that but the mere fact that it's the crux of your defense

doesn't allow something that is inadmissible to become admissible. If you want to brief this, you want to give me some case law. If I erred in this ruling I will be more than willing to reconsider it. But the mere fact that she might have said that, I don't believe that opens the door with regard to any prior conduct.

MR. KOSZTYA: If you're granting that request on behalf of the State and that's paragraph number eight for the record is clear, I ask that you do so without prejudice and allow me an opportunity to make that argument.

THE COURT: Absolutely. I never make a final ruling as to anything except maybe I've ruled on the same thing three times before. But if you can bring me some case law or some surrounding circumstances[,] I will be more than willing to revisit this."

¶ 5     The record does not indicate that defense counsel filed any additional pleadings or submitted any caselaw regarding this matter. Defendant's jury trial commenced on September 18, 2019.

¶ 6     At trial, complainant A.B. testified that she was out with her friend, Katrina Jackson and Jackson's friend, Christopher Campbell, in the early morning hours of May 12, 2019. Campbell called defendant, whom A.B. did not know, and invited him to meet the group at a hookah bar and bring tacos. Defendant arrived with the food, introduced himself as "Henry" and chatted with the group. He told them he was a cardiologist, and A.B. expressed that she previously had fluid around her heart in the past. The group talked for approximately two hours and A.B. indicated it was "normal" conversation. When the group decided to leave, Jackson called for an Uber and A.B. called for a Lyft. Campbell stated that A.B. should ride with him and defendant, in defendant's car, because they were going the same direction. A.B. agreed and got into the front

seat next to defendant: Campbell was dropped off first. When defendant arrived at A.B.'s building, she exited and then heard him turn off the car, which she found odd because she assumed he was going to keep going. As she exited defendant's car, A.B. got a call from Jackson, who was calling to make sure she made it home safely. While talking to Jackson, defendant approached her very quickly and she said to Jackson, "Whoa, he's trying to come in." When A.B. asked defendant why he got out of his car, he was adamant that he had to use the bathroom and asked to use her bathroom. A.B. initially refused, stating, "I don't know you like that. I'm not comfortable with you coming upstairs," and suggested that he use the restroom at a nearby bar or relieve himself in the alley. A.B. passed her phone to defendant and defendant spoke with Jackson, repeating that he really had to use the bathroom. Defendant returned the phone to A.B., and he and A.B. entered the building.

¶ 7     When they entered the vestibule, defendant got a FaceTime video call from Campbell. According to A.B., defendant was right up on her closely being adamant that he "just had to pee." A.B. was still on the phone with Jackson, and stalled to decide what she was going to do. Ultimately, A.B. let defendant into her apartment to use the bathroom because she was trying to be calm and "didn't want defendant to become any more aggressive." Acknowledging that she was not thinking clearly, A.B. explained that she convinced herself that defendant wasn't a stranger per se" because he was a friend of Campbell's and she accepted that he really just had to use the bathroom.

¶ 8     When they entered the lobby, A.B., who was still on the phone with Jackson, walked slowly, and hoped that defendant would change his mind. When they entered the elevator, A.B. stalled on pressing the button to her floor, and asked defendant if he could use the bathroom

somewhere else. When the elevator reached the fourth floor, A.B. and defendant got off and defendant followed her "closely" to her apartment. She unlocked the door and immediately showed defendant the bathroom, which was to the left. When defendant entered the bathroom, A.B. walked towards her kitchen to stand by her knives "just in case." However, she never made it to the kitchen because defendant was already out of the bathroom and attempting to grab her from behind. He grabbed her shoulders and upper arms from behind, and A.B. immediately turned to face him and started saying "no * * * stop, please don't do this. You don't want to do this." A.B. backed away from defendant and into the living room, while continually telling defendant to stop and that he did not want to do this. Defendant then became aggressive, pushed A.B. onto the sofa and climbed on top of her. He held her down and used his legs to try and move her legs open. A.B. was "flailing" and "yelling" and trying to move her body away from defendant. A.B. was wearing a floor-length evening gown that was attached to her body with lingerie tape and defendant ripped her dress so that the tape "kind of ripped and scratched [A.B.'s] chest." A.B. could feel defendant's erect penis near her stomach and vagina. When defendant let go of her to reach for his pants, A.B. hit the floor and ran out of the door. She ran through the hallway screaming before running into a stairwell and calling her best friend, Rachel Hardy.

¶ 9     A.B. explained that she did not call police first because she was in shock. She told Hardy that defendant tried to rape her. After hiding in the stairwell for several minutes, A.B. decided that defendant must have left and walked back to her apartment while still on the phone with Hardy. When she reached the door, she told Hardy, "I think he's gone. It seems quiet." However, when she opened the door, defendant came from around the corner, immediately grabbed the phone from A.B.'s hand and knocked her to the floor in the process. Defendant then grabbed her by the foot and tried to drag her back into the apartment. A.B. was able to escape and ran around the corner

of the U-shaped hallway, yelling for help to get her neighbors' attention, and defendant followed her and continued reaching for her. He grabbed A.B. by the arm and dragged her back towards her apartment, but A.B. was able to pull away again and run back to the other side. At that point, A.B.'s neighbor, Todd Maceira, exited his apartment. Maceira grabbed A.B. and pushed her into his apartment with his wife and went around the corner to where defendant was. Defendant subsequently left the building with A.B.'s phone.

¶ 10    A.B. testified that she suffered a scratch from the tape on her dress and an injury to her foot when defendant grabbed it. She identified photos and surveillance video from her apartment building, which the State admitted and published to the jury. The surveillance video showed: A.B. and defendant approaching the door of the building; A.B. putting her hand up towards defendant's chest telling him no and defendant following her inside; defendant showing A.B. his FaceTime call with Campbell; A.B. and defendant approaching the elevator; defendant grabbing the back of A.B.'s neck and A.B. trying to run; defendant pulling her by the arm back towards her unit; A.B. running away; and Maceira emerging from his unit. A.B. also testified that defendant ripped the sleeve of her evening gown, that was admitted into evidence, as he grabbed at her arm and wrist for the phone.

¶ 11    The police were ultimately called and A.B. identified defendant in a photo lineup the following day.

¶ 12    Jackson testified that when she arrived home, she called A.B. who sounded distressed. Jackson then spoke to defendant who told her, "It's okay." When the call was disconnected, Jackson "immediately" got into her car and drove to A.B.'s apartment based on how she sounded. She also called Campbell and the police. When she arrived to A.B.'s building, she found A.B. in her neighbor's apartment, "crying hysterically on the ground."

¶ 13    Campbell testified that he saw defendant try to play with A.B.'s hand while defendant drove them home, but A.B. "wasn't too receptive." Later, Campbell received a call from Jackson, who asked "[W]hy is your homeboy trying to go in my homegirl's spot?" Campbell then placed a FaceTime video call to defendant. When defendant answered, he appeared to be in the lobby of a building and told Campbell that he was just dropping A.B. off and would call him back.

¶ 14    Hardy testified that she was awakened on May 12, 2019, by missed telephone calls and text messages from Jackson. A.B. then called Hardy, "crying hysterically." Hardy spoke with A.B. for a minute and a half, and A.B. was "frightened," "scared" and "crying the entire time." During the first part of the call, it sounded as if A.B. was in an "open and airy" indoor space. During the last part of the call, "it changed to sound a little more secluded like [A.B.] was in a room." Hardy heard what sounded like a struggle and then the phone went dead. Hardy immediately called the police and reported a struggle taking place at A.B.'s address. She then drove to A.B.'s apartment. When Hardy arrived 10 minutes later, she found A.B. in her neighbor's apartment, still crying "hysterically." A.B. was flushed, her hair was disheveled, and her sleeve was torn. Later Hardy and A.B. went downstairs to search for A.B.'s phone but did not find it.

¶ 15    Chicago Police Detective Carolyn Young testified that she was assigned to investigate the case and located defendant based on a phone number , address, and photo that were provided. She used the photo to make a photo lineup. Detective Young also testified that A.B.'s phone was recovered from the Apple Store on Michigan Avenue.

¶ 16    Maceira testified that he was awakened early in the morning on May 12, 2019, by a woman screaming in the hallway outside his door. He opened his door and saw A.B. come around the corner of the hallway and walk towards him. A.B. appeared extremely upset, was crying and "almost collapsing." Maceira put his arms out to catch A.B. because he thought she was going to

fall. After directing A.B. to a bench in front of his apartment door, he walked down the hallway and around the corner where he saw a man waiting for an elevator approximately 20 feet away. Maceira did not attempt to stop the man because he "didn't know exactly what was going on." After the man entered the elevator, Maceira went back to his apartment. Maceira acknowledged that he "tentatively" identified someone other than defendant from a photographic lineup, but stated he told police that he was unsure whether he could positively identify the person.

¶ 17     Defendant moved for a directed verdict on the aggravated criminal sexual abuse charge, which the trial court granted. He then waived his right to testify and did not call any witnesses. At the jury instructions conference, the State proposed using both sets of bracketed language in the pattern jury instructions for home invasion: "that defendant 'knew or had reason to know that one or more persons was present' 'when [he] entered the dwelling place,' or that defendant 'remained in the dwelling place until' 'he had reason to know that one or more persons was present.'" See Ill. Pattern Jury Instructions, Criminal No. 11.53 (approved May 13, 2015) (hereinafter IPI Criminal No. 11.53). Defendant objected to the use of the "remained in the dwelling place until" language in the definition instruction, stating that the language was not included in the indictment and argued that the language was not required and also not supported by the evidence. The following exchange occurred:

"THE COURT: IPI 11.53, People's 10, definition of home invasion. Any objection?

MR. KOSZTYA: Judge, there is an objection as to how this one is written.

THE COURT: Go ahead.

MR. KOSZTYA: Specifically, - - let me get to the line. The second to the last clause, read verbatim: Or when he remains in such dwelling place until he knows or has reason to know one or more persons is present, end quote. I'm objecting to that.

* * *

THE COURT: Okay. What's your objection to that?

MR. KOSZTYA: Well, your Honor, comparing this to Count 5 and the Bill of Indictment, it makes it a completely different charge and adds another complex layer to it that was never charged against my client in the first place. And given notice of this now, this morning. There's been absolutely no change to the Bill of Indictment whatsoever. There's been no additional home invasion count. That clause is not in Count 5 of the Bill of Indictment and it has not been amended or superseded.

THE COURT: What's your response?

MR. CRONE: Judge, as your Honor well knows, theories and the evidence changes things. In this case, we heard from the witness herself, who testified that when she returned from the stairwell, back into her apartment, the defendant was inside her apartment, waiting for her, and another attack occurred.

Just because it wasn't necessarily in the indictment charge and language itself does not preclude the State from proceeding on that theory of the offense. Much like accountability is not charged in the indictment language but accountability is a theory that can be proceeded upon and has to be instructed on based on the evidence, as it's presented in court. The evidence supports this portion of the instruction, and I believe it is appropriate to give.

MR. KOSZTYA: In response, I submit that the evidence doesn't show that. I submit - -

THE COURT: Okay. What's the purpose of the charging document? What do you understand the purpose of the charging document?

MR. KOSZTYA: To put you on notice as to - -

THE COURT: Put you on notice - -

- 11 -

MR. KOSZTYA: -- what the charge is and what it is that you're defending against.

THE COURT: And to protect against double jeopardy, correct?

MR. KOSZTYA: Correct.

THE COURT: Okay. So are you saying that the IPI is going to be wrong here?

MR. KOSZTYA: I'm not saying the IPI is wrong. I'm saying - -

THE COURT: Okay. But there's not any other provision in the IPI. It either uses deadly weapon, threaten the imminent use of force, wherein it causes any injury to that person within a dwelling place.

MR. KOSZTYA: Your Honor, I submit that 11.53 could be supported without that clause. I submit that that clause is not required for a jury instruction for home invasion. That clause could be removed and it's a legitimate jury instruction under 11.53. I also submit that the evidence proffered doesn't support the proposition.

THE COURT: Okay. Well, that's the jury's determination; is it not?

MR. KOSZTYA: The jury is the finder of fact in this matter. I mean, I don't see how this is wrong. It's not like anything is superfluous that's injected into the instructions here. It looks like it's word-for-word.

* * *

MR. KOSZTYA: Your Honor, I'm submitting that the bracketed portion under 11.53, before you get to the subparts, is not required. It should not be required in this case. I submit that - -

THE COURT: You're talking about and remains in such a dwelling place until?

MR. KOSZTYA: Yes.

THE COURT: Okay. All right. I understand your objection here. I don't believe it needs to be part of the charging document. Your objection will be noted for the record."

¶ 18    With respect to the home invasion charge, the trial court instructed the jury as follows: "A person commits the offense of home invasion when he, not being a peace officer acting in the line of duty, without authority, knowingly entered the dwelling place of another when he knows or has reason to know that one or more persons is present; or when he remains in such dwelling until he knows or has reason to know one or more persons was present and intentionally caused any injury to any person within the dwelling place.

The defendant's entry into a dwelling place of another is without authority if at the time of the entry into the dwelling the defendant has intent to commit a criminal act within the dwelling, regardless of whether the defendant was initially invited into the dwelling. However, defendant's entry into the dwelling is with authority if the defendant enters a dwelling without criminal intent and was initially invited into or received consent to enter the dwelling, regardless of what defendant does after he enters.

The term injury and the definition of home invasion may include physical injury. It also includes psychological or emotional trauma, if that trauma was a result of some physical contact.

To sustain the charge of home invasion, the State must prove the follow propositions: First proposition, that defendant was not a peace officer acting in the line of duty; and, second proposition, that defendant knowingly, and without authority, entered the dwelling place of another; and, third proposition, that when the defendant entered the dwelling place, he knew or had reason to know that one or more persons was present or that the defendant remained in the dwelling place until he know or had reason to know that one or more persons were present; and,

- 13 -

fourth proposition, that defendant intentionally caused injury to [A.B.], a person within the dwelling place."

¶ 19    The jury subsequently returned guilty verdicts for home invasion, attempted criminal sexual assault, and robbery. After the jury verdict but prior to sentencing or the filing of any posttrial motions, defendant's trial counsel withdrew. Defendant secured new counsel, who represented him during the posttrial proceedings and also represents him on this appeal.

¶ 20    On October 16, 2019, posttrial counsel filed a motion for new trial, contending that the State failed to prove him guilty beyond a reasonable doubt, the trial court erred in denying defendant's motion for a directed verdict on all counts and the State failed to prove every material allegation of the information beyond a reasonable doubt. Posttrial counsel filed an amended motion for new trial on December 12, 2019, contending that: the State failed to prove defendant guilty of the charges beyond a reasonable doubt; the trial court erred in not granting defendant's motion for directed finding, specifically that for the charge of home invasion, the State failed to prove each and every element required; the trial court erred by ordering the exclusion of evidence regarding the alleged victim's prior sexual assault allegations; and the State failed to state sufficient facts in the record for the jury to find the defendant guilty beyond a reasonable doubt on any of the charges. On February 14, 2020, posttrial counsel filed a second amended motion for a new trial which restated the prior arguments raised, but further clarified that the rape shield statute did not preclude the introduction and cross examining of a rape victim regarding prior accusations of rape, citing *People v. Grano*, 286 Ill. App. 3d 278 (1996); *People v. Santos*, 211 Ill. 2d 395 (2004); and *Redmond v. Kingston*, 240 F. 3d 590 (7th Circ. 2001).

¶ 21    Defendant's posttrial motion was denied and the trial court sentenced defendant to concurrent terms of 11 years for home invasion and seven years each for attempted criminal sexual

assault and robbery on October 13, 2020. This appeal followed and oral argument was held on December 16, 2021.

¶ 22                                    II. ANALYSIS

¶ 23     On appeal, defendant contends that his rights under the grand jury clause were violated because the evidence at trial and the jury instructions constructively amended the indictment; and that he was denied his constitutional rights to cross examine the complainant and present his theory of defense.

¶ 24                    A. Constructive Amendment of the Indictment

¶ 25     Defendant first contends that his rights under the fifth amendment's grand jury clause (U.S. Const., amend. V) were violated because it limits the available bases for conviction to those contained in the indictment. He asserts that a constructive amendment to the indictment occurred when the State, through its presentation of the evidence and closing argument, and the trial court, through its instruction to the jury, broadened the possible bases for conviction beyond those presented by the grand jury. He further contends that this issue is subject to *de novo* review.

¶ 26     The State responds that defendant's argument based on the fifth amendment's grand jury clause fails because that provision does not apply to the states, and any due process argument would be forfeited and meritless. As defendant's argument and supporting caselaw are based solely on the fifth amendment's grand jury clause, the State maintains that no further analysis is necessary to reject his claim. The State further argues that, although defendant did not raise a due process argument, for the sake of completeness, any such argument would fail. The State noted that if defendant believed his conviction violated due process for lack of adequate notice based on the "remain in" theory, he was required to raise such argument both at trial and in his posttrial

motion. Because defendant did neither but merely noted during the instructions conference that defense counsel raised a general objection to the "remains in" language, the State maintains that this did not amount to a due process argument. The State made this assertion because: the indictment was required to include the "remains in" language; he was unaware that he could be convicted on a "remaining" theory; or the absence of the "remains in" language affected his trial preparation or otherwise prejudiced him. Thus, any due process argument is forfeited. Finally, the State asserts that, forfeiture aside, any due process argument based on these facts would fail because a defendant has the right to be informed of the "nature and cause" of the charge against him, not the manner in which it was committed. Therefore, the State concludes that the indictment was sufficient.

¶ 27 Defendant's reply brief acknowledges that the fifth amendment's grand jury clause does not apply to the states, but argues instead that the grand jury clause of the Illinois Constitution, (Ill. Const. 1970, art. I, § 7), provides greater protection than the fifth amendment. He reasserts his argument that the indictment may not be broadened through amendment except by the grand jury itself. With respect to the State's contention that he failed to properly preserve any argument that his conviction on a "remaining" theory violated due process, defendant argues that his counsel objected prior to the instructions conference, which was also relayed to the jury by the trial court. He contends, however, that even if the requirements set forth in *People v. Enoch*, 122 Ill. 2d 176 (1988), that an objection has to be made at trial and the matter included in a posttrial motion, were not met, the constructive amendment of the indictment constitutes plain error because it deprived him of being fully apprised of the charges against him and as a result, deprived him of his constitutional right to prepare a defense against the home invasion charge on the basis that he remained in the dwelling. He further argues that it constitutes plain error because the State "made

the deliberate decision" to indict him for home invasion based on unauthorized entry, which would have exposed him to future prosecution based on the "remaining within" theory.

¶ 28    As a threshold matter, defendant's posttrial motion did not raise any issue of variance between the indictment, evidence presented at trial, and the jury instructions. Our review of the record reveals that defendant only objected at the instructions conference to the definition of home invasion that was included in the State's jury instructions. The State contends that defendant has forfeited review of this issue because it was not raised in his posttrial motion. We reject the State's contention because a challenge to the sufficiency of the charging instrument may be raised for the first time on appeal. *People v. Jones*, 245 Ill. App. 3d 674, 676 (1993); *People v. Vaughn*, 136 Ill. App. 3d 342, 354 (1985). This is because due process concerns are implicated. *People v. DiLorenzo*, 169 Ill. 2d 318, 321 (1996). Accordingly, we will review defendant's issue on the merits.

¶ 29    Next, we review defendant's initial contention that there was a violation of his constitutional rights under the grand jury clause of the fifth amendment. As noted by the State, and conceded by defendant in his reply brief, the provision of the fifth amendment requiring indictment by a grand jury is not applicable to State criminal proceedings. See *People v. Redmond*, 67 Ill. 2d 242, 246 (1977), (citing *Hurtado v. California*, 110 U.S. 516-535-38 (1884)). We are left then with a variance claim, that is, whether there was a variance between the indictment, trial evidence, and jury instructions: and if so, whether the variance was "fatal."

¶ 30    A defendant has a fundamental right to be informed of the nature and cause of criminal accusations made against him. *People v. Espinoza*, 2015 IL 118218, ¶ 15; *People v. Stephenson*, 2016 IL App (1st) 142031, ¶ 16. Section 111-3(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/111-3(a) (West 2018)) states that a charge must be in writing and allege

commission of an offense by: (1) stating the name of the offense, (2) citing the statutory provision alleged to have been violated; (3) setting forth the nature and elements of the offense charged; (4) stating the date and county of the offense as definitely as can be done; (5) stating the name of the accused, if known, and if not known, designate the accused by any name or description by which he can be identified with reasonable certainty. 725 ILCS 5/111-3(a) (1-5) (West 2018). Whether a charging instrument was sufficient is a question of law that we review *de novo*. *Espinoza*, 2015 IL 118218, ¶ 15.

¶ 31    Once an indictment is returned by the grand jury, it may not be broadened through amendment except by the grand jury itself. *People v. Ross*, 395 Ill. App. 3d 660, 667 (2009). The purpose of this rule is to ensure that citizens' rights are not at the mercy or control of a prosecutor. *Id.*

¶ 32    The timing of the challenge to the indictment determines whether a defendant must show that he was prejudiced by any defect in the charging instrument. *Id*. at ¶ 23. If an indictment or information is challenged in a pretrial motion, it must strictly comply with the pleading requirements of section 111-3(a). *People v. Rowell*, 229 Ill. 2d 82, 93 (2008). At that juncture, if the indictment or information does not strictly comply with the pleading requirements of section 111-3(a), the proper remedy is dismissal. *Id.*

¶ 33    However, when an indictment or information is challenged for the first time posttrial, case law and statutes require a defendant to show that he was prejudiced in preparing his defense. *Id.* See also *People v. Davis*, 217 Ill. 2d 472, 479 (2005); *People v. Gilmore*, 63 Ill. 2d 23, 29 (1976); 725 ILCS 5/116-2(c) (West 2018). Consequently, when, as here, the indictment or information is challenged for the first time on appeal, our review is limited to determining whether the indictment apprised defendant of the precise offense charged with sufficient specificity to prepare his defense

and would allow defendant to plead a resulting conviction as a bar to future prosecution arising out of the same conduct. *Id.* See also *People v. Benitez*, 169 Ill. 2d 245, 257 (1996); *People v. Winford*, 383 Ill. App. 3d 1, 4 (2008).

¶ 34    The State must prove the essential elements of the charging instrument. *People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 67. A variance between allegations in an indictment and proof at trial is fatal to a conviction if the variance is material and could mislead the accused in making his defense (*Winford*, 383 Ill. App. 3d at 4) or expose him to double jeopardy (*People v. Arndt*, 351 Ill. App. 3d 505, 518 (2004)).

¶ 35    We consider the plain and ordinary meaning of the language in the indictment as read and interpreted by a reasonable person. *Arndt*, 351 Ill. App. 3d at 517-18. A charging instrument is to be read as a whole, and where a statute is cited in a count, the statute and count are to be read together. *Id.* at 518. If the essential elements of an offense are properly charged but the manner in which the offense is committed is incorrectly alleged, the error is one of form. *Lattimore*, 2011 IL App (1st) 093238, ¶ 67.

¶ 36    An indictment need not state specifically the statute violated by the acts alleged to be a crime, and this holds true when there are several statutory provisions under which the charge might fall. *People v. Pronger*, 48 Ill. App. 2d 477, 481 (1964). It is not necessary that an indictment contain all the language of the statute on the subject. *Id.* When a crime can be committed by several acts, a variance between the act named in the indictment and the act proved will not be fatal. *Lattimore*, 2011 IL App (1st) 093238, ¶ 69.

¶ 37    In the case at bar, count 5 of the indictment charged defendant with home invasion as follows:

"*** he, not being a peace officer acting in the line of duty, without authority, knowingly entered the dwelling place of another, to wit: the dwelling place of A.B., located at 1147 West Ohio #402 in Chicago, Cook County, Illinois, and he knew or had reason to know that one or more persons were present, and he intentionally caused any injury, other than by the discharge of a firearm, to A.B., within the dwelling place, to wit: pain to A.B.'s body, in violation of Chapter 720 Act 5 Section 19-6(a)(2) of the Illinois Compiled Statutes 1992 as amended***."

¶ 38    Section 19-6 of the Criminal Code of 2012 (Criminal Code) defines the offense of home invasion as follows:

"(a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or he or she knowingly enters the dwelling place of another and remains in the dwelling place until he or she knows or has reason to know that one or more persons is present * * * and

* * *

(2) [i]ntentionally causes any injury except as provided in subsection (a)(5), to any person or persons within the dwelling place * * *." 720 ILCS 5/19-6(a)(2) (West 2018).

¶ 39    IPI Criminal No. 11.53 which defines home invasions, reads as follows:

"A person commits the offense of home invasion when he, *[(not being a peace officer acting in the line of duty, without authority, knowingly enters the dwelling place of another) (falsely represents himself, including but not limited to, falsely represents himself to be a representative of any unit of government or a construction company or a telecommunications company or a utility company for the purpose of gaining entry to the*

*dwelling place of another)] [(when) (and remains in such dwelling place until)]* he knows or has reason to know that one or more persons is present), and * * * [2] intentionally causes any injury to any person within the dwelling place * * *." (Emphasis in original).

¶ 40    As noted above, because defendant challenges the indictment for the first time on appeal, we measure the sufficiency of the indictment by the following test: (1) whether it apprised him of the precise offense charged (2) with sufficient specificity to prepare his defense and (3) allowed pleading a resulting conviction as a bar to future prosecution from the same conduct. *Stephenson*, 2016 IL App (1st) 142031, ¶ 18.

¶ 41    Turning to the facts of this case, we find that there was no fatal variance between the indictment, evidence presented at trial, and the jury instructions as the indictment apprised him of the offense of home invasion as found in the statute. Thus, defendant has failed to satisfy any part of the test.

¶ 42    First, the indictment essentially quoted the language of the home invasion statute. The statute provides that home invasion can be committed by a person who enters someone's dwelling without authorization when someone is home or enters and remains in the dwelling until someone is home. While defendant is correct that the indictment does not contain the "remains in the dwelling place" language, we note that the indictment does cite to the home invasion statute which does contain said language. As an indictment that cites a statute must be read together with the statute (*Arndt*, 351 Ill. App. 3d at 518), we find that defendant had sufficient notice that any or all of the provisions of section 19-6 were being raised in this case. The home invasion statute details three ways in which a person can commit the offense; thus, any variance between the act named in the indictment and the means or manner by which defendant committed the act as proved at trial is not fatal. See *Lattimore*, 2011 IL App (1st) 093238, ¶ 69. Contrary to defendant's assertion,

there was no broadening of the possible bases for his conviction as the indictment specifically stated that he was charged with violation of section 19-6.

¶ 43 Second, defendant has failed to establish that the challenged variance prejudiced the preparation of his defense in any way. As noted above, when the essential elements of an offense are properly charged but the manner in which the offense is committed is incorrectly alleged, the error is one of form. *Winford*, 383 Ill. App. 3d at 5. There is no question that defendant knew he was accused of home invasion under section 19-6 of the Criminal Code. Defendant was provided with a probable cause statement on June 22, 2019, which detailed A.B.'s version of events, including the fact that defendant was still in her apartment when she returned, and that he attacked her again. At trial, defendant's theory of the case before and after trial was that he was invited and so his presence was authorized. Defendant did not present any witnesses but cross-examined the State's witnesses. In closing argument, defense counsel additionally argued that there was no evidence showing that defendant ever went back into A.B.'s home, that he was inside the home when A.B. returned, or that her ankle was grabbed, causing her to fall. Nevertheless, defendant has not shown how a variance between the indictment, proof at trial, and jury instructions about the manner in which the home invasion was committed was material or inadequate notice of the charge. As any such variance was a matter of form rather than substance, we conclude that it was not material and did not prejudice defendant.

¶ 44 Third, defendant has not been exposed to double jeopardy. Defendant's indictment specified his name, the date and place of the offense, the statutory provision alleged to have been violated, and set forth in the language of the statute the nature and elements of the offense charged. 725 ILCS 5/111-3(a) (West 2018). If any future prosecution was attempted, prior prosecution on the same facts could be proved by the record. See *Stephenson*, 2016 IL App (1st) 142031, ¶ 23;

*Lattimore*, 2011 IL App (1st) 093238, ¶ 71; *Winford*, 383 Ill. App. 3d at 6; *Arndt*, 351 Ill. App. 3d at 518-19; *Jones*, 245 Ill. App. 3d at 677.

¶ 45    Therefore, we cannot say that the variance between the indictment, the proof at trial and the jury instructions about the manner in which defendant committed home invasion was either material, inadequate notice of the charge, or would expose him to double jeopardy. Thus, said variance was not fatal.

¶ 46                    B. Violation of Right to Cross Examine Complainant

¶ 47    Next, defendant contends that he was denied his constitutional rights to cross examine complainant and present his theory of defense. This argument is based on trial counsel's argument at the hearing on the State's motion *in limine* that the defense should be allowed to question complainant about any prior instances of rape that might affect her outlook on the circumstances involving defendant. Specifically, defendant contends that the rape shield statute is inapplicable to complainant's unprovoked excited utterance to police that she had been raped before and that the statement was admissible as an exception under section 7(a) of the rape shield statute (725 ILCS 5/115-7(a) (West 2018)) as "constitutionally required:" in this case, to safeguard his sixth amendment right to confront witnesses against him. U.S. Const., amend. VI. Defendant asserts that he was unable to present his theory of the case: namely, that complainant was "hypersensitive and filled with anxiety of being alone with a man" because she had been raped before. Defendant does not, however, request that this court review this issue under plain error.

¶ 48    The State responds that this particular argument is forfeited as defendant never raised any challenge to the exclusion of the evidence under the rape shield statute as a violation of his sixth amendment rights. The State further contends that the argument fails on its merits because whether A.B. was raped on a prior occasion was irrelevant; the assumption that A.B. was raped before was

speculative; the exclusion ruling was within the trial court's discretion; and any possible error was harmless and nothing in the ruling precluded defendant from testifying on his own behalf.

¶ 49    Our examination of defendant's posttrial motion, amended posttrial motion and second amended posttrial motion reveal that he did not raise this precise issue. No challenge to the pretrial ruling was raised in the initial posttrial motion; the amended posttrial motion stated only that "[t]he Court erred by ordering the exclusion of evidence with regard to the alleged victim's prior sexual assault allegations." The second amended posttrial motion stated: "[t]he Court erred by ordering the exclusion of evidence with regard to the alleged victim's prior sexual assault allegations. It is well established the Rape Shield Act does not preclude the introduction of and cross examination of a rape victim regarding prior accusations of rape," citing *People v. Grano*, 286 Ill. App. 3d 278 (1996); *People v. Santos*, 211 Ill. 2d 395 (2004); and *Redmond v. Kingston*, 240 F. 3d 590 (7th Circ. 2001).

¶ 50    Generally, a claim is forfeited when not raised both contemporaneously and specifically in a posttrial motion. *People v. Woods*, 214 Ill. 2d 455, 471 (2005); *People v. Burnett*, 2015 IL App (1st) 133610, ¶ 75. Failure to preserve an alleged error for review is a procedural default. *People v. Rivera*, 277 Ill. App. 3d 811, 818 (1996).

¶ 51    Where errors or defects affect substantial rights, deny the accused a fair and impartial trial, or involve evidence that is closely balanced, a reviewing court may choose to consider the issue. *People v. Ward*, 154 Ill. 2d 272, 294 (1992). Additionally, as our supreme court noted in *Cregan*, there are three types of claims not subject to forfeiture for failing to file a post-trial motion: (1) constitutional issues that were properly raised at trial and may be raised later in a postconviction petition; (2) challenges to the sufficiency of the evidence; and (3) plain errors. *Cregan*, 2014 IL 113600, ¶ 15 (citing *Enoch*, 122 Ill. 2d at 190).

¶ 52    Here, although defendant did not specifically raise a constitutional challenge to the application of the rape shield statute in his posttrial motions thereby triggering forfeiture of those issues, he did make a constitutional challenge by way of objection at the pretrial hearing and could raise it again later in a postconviction petition. We will therefore apply the constitutional challenge exception to the forfeiture. We now turn to the merits of his contention.

¶ 53    A defendant has a right, pursuant to the confrontation clause in the sixth amendment, to cross examine a witness in order to show motive, bias, or other factors which might influence testimony. *People v. Davis*, 337 Ill. App. 3d 977, 984 (2003). A trial court may exclude evidence when its relevancy is so speculative that it is of little probative value. *Id.* at 985.

¶ 54    The Illinois rape shield statute bars evidence of the alleged victim's prior sexual activity or reputation, subject to two exceptions: (1) evidence of past sexual activities with the accused, offered as evidence of consent; and (2) where the admission of such evidence is constitutionally required." 725 ILCS 5/115-7 (West 2018); *People v. Santos*, 211 Ill. 2d 395, 401-02 (2004). In this case, the second exception is at issue.

¶ 55    The purpose of the rape shield statute "is to prevent the defendant from harassing and humiliating the complaining witness with evidence of either her reputation for chastity or specific acts of sexual conduct with persons other than [the] defendant." *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 42. However, the rape shield's preclusion of prior sexual conduct is not absolute and should not be mechanically applied to "obscure relevant evidence that bears directly on guilt or innocence." *People v. Hill*, 289 Ill. App. 3d 859, 862 (1997). The statute's "when constitutionally required" exception requires that a defendant be permitted to offer certain evidence which is directly relevant to matters at issue in the case, even if it concerns the victim's prior sexual activity. *Johnson*, 2014 IL App (2d) 121004, ¶ 42. The question is of relevance and

the victim's sexual history is not constitutionally required to be admitted unless it would make a meaningful contribution to the fact-finding process. *People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 23. Our supreme court has recognized that under the second exception, a defendant's constitutional right to confront witnesses, must, in certain circumstances, supersede the statutory exclusion. *Davis*, 337 Ill. App. 3d at 985. A defendant's constitutional right to cross examine a witness is not defeated by the statute where the evidence of a victim's past sexual conduct is relevant and tends to establish bias, motive, or prejudice. *Id.* (citing *People v. Sandoval*, 135 Ill. 2d 159, 174-75 (1990)).

¶ 56 We thus determine whether the trial court erred in ruling that complainant's excited utterance that she was previously raped was barred by the rape shield statute.

¶ 57 It is well-settled that evidentiary rulings made pursuant to the rape shield statute are reviewed for an abuse of discretion. *Id.* ¶ 26. An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court. *Id.*

¶ 58 The rape shield statute requires a defendant seeking to use the "constitutionally required" exception to make an offer of proof with specific and detailed information. *Id.* ¶ 28. And even when admissible, such information may still be rejected if it is not relevant – "of little probative value because of remoteness, uncertainty or conjectural nature." *Id.*

¶ 59 In this case, trial counsel made general, speculative statements about why and how complainant's statement to police regarding a prior rape would be relevant to defendant's case. Specifically, counsel argued, as appellate counsel now argues, that it was possible that complainant's past experience of being raped made her hypersensitive to being alone with men because of the lasting effect such experience would have on her.

¶ 60    We find defendant's theory that a prior rape would make complainant hypersensitive to be pure conjecture and therefore irrelevant to the issue of whether this defendant committed the offense of attempted criminal sexual assault. Defendant did not make an offer of proof in the trial court regarding the relevance of this evidence, and we find that defendant is unable to prove its relevance without supporting evidence validating his theory. Pursuant to *Sandoval*, 135 Ill. 2d at 174-75, the evidence must be relevant to supersede the protections of the rape shield statute. There has been no such showing here. We conclude that the trial court did not abuse its discretion in refusing to allow the cross examination.

¶ 61                                     CONCLUSION

¶ 62    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 63    Affirmed.

¶ 64    PRESIDING JUSTICE PIERCE, dissenting.

¶ 65    Defendant contends that his rights under the grand jury clause were violated because the evidence at trial and the jury instructions constructively amended the indictment. Although defendant had some difficulty framing this issue in his briefs before this court, the majority ultimately considered defendant's argument as a variance claim, finding that no variance existed between the indictment, the evidence presented at trial and the jury instructions. I disagree and find the variance between the charging instrument and the jury instructions particularly problematic, given that the jury instructions improperly stated the law of home invasion. The erroneous home invasion jury instruction, coupled with the State's argument that defendant "staying" in the apartment was sufficient to prove guilt, when the offense of home invasion by "entering and staying" was not charged, deprived defendant of a fair trial. Therefore, I respectfully dissent and find this case should be remanded for a new trial.

¶ 66    Home invasion occurs when: "(a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or he or she knowingly enters the dwelling place of another and remains in the dwelling place until he or she knows or has reason to know that one or more persons is present or who falsely represents himself or herself, including but not limited to, falsely representing himself or herself to be a representative of any unit of government or a construction, telecommunications, or utility company, for the purpose of gaining entry to the dwelling place of another when he or she knows or has reason to know that one or more persons are present and;

    (1) While armed with a dangerous weapon, other than a firearm, uses force or threatens the imminent use of force upon any person or persons within the dwelling place whether or not injury occurs, or

    (2) Intentionally causes any injury, except as provided in subsection (a)(5), to any person or persons within the dwelling place, or

    (3) While armed with a firearm uses force or threatens the imminent use of force upon any person or persons within the dwelling place whether or not injury occurs, or

    (4) Uses force or threatens the imminent use of force upon any person or persons within the dwelling place whether or not injury occurs and during the commission of the offense personally discharges a firearm, or

    (5) Personally discharges a firearm that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death to another person within the dwelling place, or

(6) Commits, against any person or persons within that dwelling place, a violation of Section 11-1.20, 11-1.30, 11-1.40, 11-1.50, or 11-1.60 of this Code." 720 ILCS 5/19-6(a) (West 2020).

¶ 67     In summary, home invasion occurs either when a defendant without authority "enters the dwelling place of another knowing its occupied" and intentionally commits one of the acts enumerated in subsections (1) thru (6) *or* knowingly enters the dwelling place of another *and* remains in the dwelling place until he knows someone is present and intentionally performs one of the enumerated acts. 720 ILCS 5/19-6(a) (West 2020) (emphasis added). Based on the plain language of the statute, there are two ways to commit the offense of home invasion centered on the act of unauthorized entry knowing the dwelling is occupied or entering and remaining after occupancy is known. See *People v. Bradford*, 2016 IL 118674, ¶ 13 (there are  two possible ways to commit the crime of burglary: (1) entering without authority with the intent to commit a felony or theft or (2)  by remaining without authority with the intent to commit a felony or theft.).

¶ 68     A defendant has the fundamental right, under both the Federal (U.S. Const., amend. VI) and State constitutions (Ill. Const.1970, art. I, sec. 8), to be informed of "the nature and cause" of criminal accusations made against him. When a defendant attacks the sufficiency of an indictment for the first time on appeal, we must determine whether the indictment provided defendant with sufficient specificity as to the crime charge so that defendant may adequately prepare his defense. *People v. DiLorenzo*, 169 Ill. 2d 318, 321-22 (1996). Here, defendant was charged with a single count of home invasion: *entering* a dwelling place knowing it was occupied with the intent to cause bodily injury. It was alleged, and proven, that defendant, "without authority, knowingly entered the dwelling place of another, to wit: the dwelling place of A.B., located at 1147 West Ohio #402 in Chicago, Cook County, Illinois, and he knew or had reason to know that one or more persons

were present, and he intentionally caused an injury, other than by the discharge of a firearm, to A.B., within the dwelling place, to wit: pain to A.B.'s body." To be clear, defendant was only charged with "entering." There was no charge alleging the second way home invasion could be committed: *entering and remaining* in the dwelling after he learns someone is present. Although defendant did not challenge the sufficiency of the evidence on appeal, the evidence is sufficient to establish beyond a reasonable doubt that defendant did in fact commit the crime as charged: entering with intent to cause bodily injury.

¶ 69    While the evidence certainly conforms to the indictment, the jury instructions allowed the jury to consider elements of the uncharged offense of home invasion -- entering and remaining -- in addition to improperly stating the law and effectively prevented defendant from preparing and presenting an adequate defense.[1] Although the written instructions have not been included in the record on appeal, the circuit court orally instructed the jury that defendant could be found guilty of home invasion if they found he "knowingly entered the dwelling place of another when he knows or has reason to know that one or more persons is present; **or** when he remains in such dwelling until he knows or has reason to know one or more persons was present and intentionally caused any injury to any person within the dwelling place." The court further instructed,

> "To sustain the charge of home invasion, the State must prove the following
>
> propositions: First proposition, that defendant was not a peace officer acting in the line of
>
> duty; and, second proposition, that defendant knowingly, and without authority, entered
>
> the dwelling place of another; and, third proposition, that when the defendant entered the

---

[1] Rule 451(c) provides that "substantial defects" in jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require." 177 Ill.2d R. 451(c); *People v. Williams*, 181 Ill.2d 297, 317-18 (1998). This rule allows a reviewing court to consider issues despite waiver if the error is so fundamental and of such magnitude that the defendant was denied a fair trial or if the evidence is closely balanced. *People v. Rios*, 318 Ill. App. 3d 354, 361 (2000).

dwelling place, he knew or had reason to know that one or more persons was present *or that the defendant remained in the dwelling place until he knew or had reason to know that one or more persons were present*; and, fourth proposition, that defendant intentionally caused injury to [A.B.], a person within the dwelling place." (Emphasis added).

¶ 70 Defendant was only charged with one count of home invasion to wit: that he knowingly entered the dwelling place of another. However, the first instruction informed the jury that it could convict defendant of home invasion if they found that defendant merely remained in the dwelling place, without the element of unlawful entry. This is problematic because defendant was not charged with merely remaining in the dwelling. He was charged with knowingly entering without authority. Defendant objected to the jury instruction as given on this basis and argued that he was not put on notice that he would be required to prepare a defense to the second form of home invasion: that he entered and remained in the dwelling after he learned of another's presence.

¶ 71 In addition to the obvious broadening of the indictment, the first instruction improperly states the law by informing the jury it could convict defendant if it found that defendant merely remained in the dwelling. A defendant is guilty of home invasion if, without authority, he enters an occupied residence *or he enters and remains after learning of it being occupied*. 720 ILCS 5/19-6(a) (West 2020) (emphasis added); see also IPI Criminal 4th 11.54. Notwithstanding the fact that defendant was not charged with home invasion in that he entered and remained, including this additional proposition in the jury instruction allowed the jury to convict defendant of home invasion based on evidence that he merely remained in the dwelling without also requiring a finding that he entered without authority. The jury should have not been allowed to consider only evidence of remaining without also being convinced of evidence of unlawful entry.

¶ 72    The second instruction compounds the errors in the first instruction by giving the jury contradictory instructions. The first instruction allows for a conviction of home invasion if the defendant knowingly entered *or* remained. The second instruction allows for a conviction of home invasion if the defendant knowingly entered *and* remained. Where conflicting instructions are given, one of which is a correct statement of the law and the other is an incorrect statement of the law, the error is not harmless and constitutes grave error. *People v. Haywood*, 82 Ill.2d 540, 545 (1980).

¶ 73    The variance between the one form of home invasion charged in the indictment and the jury instructions, as well as the improper definition of the offense contained in the jury instructions were further highlighted to the jury during the State's closing argument causing additional prejudice to defendant. During closing argument, the prosecutor argued:

"You'll receive that instruction regarding the charge of home invasion, and it's going to read as follows: A person commits the offense of home invasion when he, without authority, knowingly enters the dwelling place of another when he knows or has reason to know that one or more persons is present; *or when he remains* in such dwelling place until he knows or has reason to know one or more persons is present and intentionally causes any injury to any person within that dwelling place.

To sustain the charge of home invasion, the State must prove the following propositions: First, that the defendant was not a peace officer, acting in the line of duty; and second, that the defendant knowingly, and without authority, entered the dwelling place of another; and, third, that when the defendant entered the dwelling place, he knew or had reason to know that one or more persons was present; or that the defendant remained in the dwelling place until he knew or had reason to know that another – that

one or more persons were present; and, fourth, that the defendant intentionally caused injury to Ashley Bryant, a person within the dwelling place.

Now throughout the trial, you've heard about two separate incidents where the defendant committed a home invasion. The first, when he first walked into the apartment with Ashley; right? And the second incident, where he wandered around the building and came back, snuck back into that apartment and waited for Ashley to return.

* * * * *

And I would like to briefly go over that second act. The second time he committed a home invasion. ...Now with respect to the third proposition – and I've highlighted the relevant portion here. That when the defendant entered into the dwelling place, he knew or had reason to know that one or more other persons were present or that the defendant remained in the dwelling place until he knew or had reason to know that one or more persons were present.

We know he wandered throughout the apartment building looking for her, right? And when he couldn't find her, he went back and he remained in the dwelling place until he knew – until she came back. So that proposition, the State has met that – presented evidence with respect to that proposition. (Emphasis added.)"

¶ 74    In my opinion, is perfectly clear that the State argued for a conviction on the second form of home invasion: unlawful entry and remaining where it failed to charge defendant with that conduct in the indictment. If the State had a second count charging defendant with the second form of home invasion this argument would have been proper. But it did not, and defendant suffered prejudice as a result of the variance between the charging instrument, the State's argument urging conviction based on the uncharged elements of the second form of home invasion and the improper

jury instructions misstating the elements of the offense. As a result, defendant was prejudiced and precluded from adequately preparing his defense.

¶ 75    For these reasons, I respectfully dissent.